# BASIC INC. ET AL. *v.* LEVINSON ET AL.

No. 86–279.   Argued November 2, 1987—Decided March 7, 1988

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, and in Parts I, II, and III of which WHITE and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post,* p. 250. REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., took no part in the consideration or decision of the case.

*Joel W. Sternman* argued the cause for petitioners. With him on the briefs were *H. Stephen Madsen, Norman S. Jeavons, William W. Golub, Ambrose Doskow, Arnold I. Roth,* and *Katherine M. Blakeley.*

*Wayne A. Cross* argued the cause for respondents. With him on the brief were *David S. Elkind* and *Lee A. Pickard.**

JUSTICE BLACKMUN delivered the opinion of the Court.

This case requires us to apply the materiality requirement of § 10(b) of the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.*, and the Securities and Exchange Commission's Rule 10b–5, 17 CFR § 240.10b–5 (1987), promulgated thereunder, in the context of preliminary corporate merger discussions. We must also determine whether a person who traded a corporation's shares on a securities exchange after the issuance of a materially misleading statement by the corporation may invoke a rebuttable presumption that, in trading, he relied on the integrity of the price set by the market.

I

Prior to December 20, 1978, Basic Incorporated was a publicly traded company primarily engaged in the business of manufacturing chemical refractories for the steel industry. As early as 1965 or 1966, Combustion Engineering, Inc., a company producing mostly alumina-based refractories, expressed some interest in acquiring Basic, but was deterred from pursuing this inclination seriously because of antitrust concerns it then entertained. See App. 81–83. In 1976, however, regulatory action opened the way to a renewal of

---

*Briefs of *amici curiae* urging reversal were filed for the American Corporate Counsel Association by *Stephen M. Shapiro, Andrew L. Frey, Kenneth S. Geller, Daniel Harris,* and *Mark I. Levy;* for Arthur Andersen & Co. et al. by *Victor M. Earle III, Carl D. Liggio, Donald Dreyfus, Harris J. Amhowitz, Kenneth H. Lang, Richard H. Murray, Leonard P. Novello,* and *Eldon Olson;* and for the American Institute of Certified Public Accountants by *Louis A. Craco.*

*Solicitor General Fried, Deputy Solicitor General Cohen, Jerrold J. Ganzfried, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Eric Summergrad, Katharine B. Gresham,* and *Max Berueffy* filed a brief for the United States as *amicus curiae.*

Combustion's interest.[1]  The "Strategic Plan," dated October 25, 1976, for Combustion's Industrial Products Group included the objective: "Acquire Basic Inc. $30 million."  App. 337.

Beginning in September 1976, Combustion representatives had meetings and telephone conversations with Basic officers and directors, including petitioners here,[2] concerning the possibility of a merger.[3]  During 1977 and 1978, Basic made three public statements denying that it was engaged in merger negotiations.[4]  On December 18, 1978, Basic asked

[1] In what are known as the *Kaiser-Lavino* proceedings, the Federal Trade Commission took the position in 1976 that basic or chemical refractories were in a market separate from nonbasic or acidic or alumina refractories; this would remove the antitrust barrier to a merger between Basic and Combustion's refractories subsidiary.  On October 12, 1978, the Initial Decision of the Administrative Law Judge confirmed that position.  See *In re Kaiser Aluminum & Chemical Corp.*, 93 F. T. C. 764, 771, 809–810 (1979).  See also the opinion of the Court of Appeals in this case, 786 F. 2d 741, 745 (CA6 1986).

[2] In addition to Basic itself, petitioners are individuals who had been members of its board of directors prior to 1979: Anthony M. Caito, Samuel Eels, Jr., John A. Gelbach, Harley C. Lee, Max Muller, H. Chapman Rose, Edmund G. Sylvester, and John C. Wilson, Jr.  Another former director, Mathew J. Ludwig, was a party to the proceedings below but died on July 17, 1986, and is not a petitioner here.  See Brief for Petitioners ii.

[3] In light of our disposition of this case, any further characterization of these discussions must await application, on remand, of the materiality standard adopted today.

[4] On October 21, 1977, after heavy trading and a new high in Basic stock, the following news item appeared in the Cleveland Plain Dealer:

"[Basic] President Max Muller said the company knew no reason for the stock's activity and that no negotiations were under way with any company for a merger.  He said Flintkote recently denied Wall Street rumors that it would make a tender offer of $25 a share for control of the Cleveland-based maker of refractories for the steel industry."  App. 363.

On September 25, 1978, in reply to an inquiry from the New York Stock Exchange, Basic issued a release concerning increased activity in its stock and stated that

"management is unaware of any present or pending company development that would result in the abnormally heavy trading activity and price fluc-

the New York Stock Exchange to suspend trading in its shares and issued a release stating that it had been "approached" by another company concerning a merger. *Id.*, at 413. On December 19, Basic's board endorsed Combustion's offer of $46 per share for its common stock, *id.*, at 335, 414–416, and on the following day publicly announced its approval of Combustion's tender offer for all outstanding shares.

Respondents are former Basic shareholders who sold their stock after Basic's first public statement of October 21, 1977, and before the suspension of trading in December 1978. Respondents brought a class action against Basic and its directors, asserting that the defendants issued three false or misleading public statements and thereby were in violation of § 10(b) of the 1934 Act and of Rule 10b–5. Respondents alleged that they were injured by selling Basic shares at artificially depressed prices in a market affected by petitioners' misleading statements and in reliance thereon.

The District Court adopted a presumption of reliance by members of the plaintiff class upon petitioners' public statements that enabled the court to conclude that common questions of fact or law predominated over particular questions pertaining to individual plaintiffs. See Fed. Rule Civ. Proc. 23(b)(3). The District Court therefore certified respondents' class.[5] On the merits, however, the District Court granted

---

tuation in company shares that have been experienced in the past few days." *Id.*, at 401.

On November 6, 1978, Basic issued to its shareholders a "Nine Months Report 1978." This Report stated:

"With regard to the stock market activity in the Company's shares we remain unaware of any present or pending developments which would account for the high volume of trading and price fluctuations in recent months." *Id.*, at 403.

[5] Respondents initially sought to represent all those who sold Basic shares between October 1, 1976, and December 20, 1978. See Amended Complaint in No. C79–1220 (ND Ohio), ¶ 5. The District Court, however, recognized a class period extending only from October 21, 1977, the date of the first public statement, rather than from the date negotiations allegedly

summary judgment for the defendants. It held that, as a matter of law, any misstatements were immaterial: there were no negotiations ongoing at the time of the first statement, and although negotiations were taking place when the second and third statements were issued, those negotiations were not "destined, with reasonable certainty, to become a merger agreement in principle." App. to Pet. for Cert. 103a.

The United States Court of Appeals for the Sixth Circuit affirmed the class certification, but reversed the District Court's summary judgment, and remanded the case. 786 F. 2d 741 (1986). The court reasoned that while petitioners were under no general duty to disclose their discussions with Combustion, any statement the company voluntarily released could not be "'so incomplete as to mislead.'" *Id.*, at 746, quoting *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 862 (CA2 1968) (en banc), cert. denied *sub nom. Coates* v. *SEC*, 394 U. S. 976 (1969). In the Court of Appeals' view, Basic's statements that no negotiations were taking place, and that it knew of no corporate developments to account for the heavy trading activity, were misleading. With respect to materiality, the court rejected the argument that preliminary merger discussions are immaterial as a matter of law, and held that "once a statement is made denying the existence of any discussions, even discussions that might not have been material in absence of the denial are material because they make the statement made untrue." 786 F. 2d, at 749.

The Court of Appeals joined a number of other Circuits in accepting the "fraud-on-the-market theory" to create a rebuttable presumption that respondents relied on petitioners' ma-

---

commenced. In its certification decision, as subsequently amended, the District Court also excluded from the class those who had purchased Basic shares after the October 1977 statement but sold them before the September 1978 statement, App. to Pet. for Cert. 123a–124a, and those who sold their shares after the close of the market on Friday, December 15, 1978. *Id.*, at 137a.

terial misrepresentations, noting that without the presumption it would be impractical to certify a class under Federal Rule of Civil Procedure 23(b)(3). See 786 F. 2d, at 750–751.

We granted certiorari, 479 U. S. 1083 (1987), to resolve the split, see Part III, *infra*, among the Courts of Appeals as to the standard of materiality applicable to preliminary merger discussions, and to determine whether the courts below properly applied a presumption of reliance in certifying the class, rather than requiring each class member to show direct reliance on Basic's statements.

## II

The 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy of full disclosure.'" *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 477–478 (1977), quoting *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963).

Pursuant to its authority under § 10(b) of the 1934 Act, 15 U. S. C. § 78j, the Securities and Exchange Commission promulgated Rule 10b–5.[6] Judicial interpretation and applica-

---

[6] In relevant part, Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

.     .     .     .     .

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ,

.     .     .     .     .

"in connection with the purchase or sale of any security."

tion, legislative acquiescence, and the passage of time have removed any doubt that a private cause of action exists for a violation of § 10(b) and Rule 10b–5, and constitutes an essential tool for enforcement of the 1934 Act's requirements. See, *e. g., Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 196 (1976); *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 730 (1975).

The Court previously has addressed various positive and common-law requirements for a violation of § 10(b) or of Rule 10b–5. See, *e. g., Santa Fe Industries, Inc.* v. *Green, supra* ("manipulative or deceptive" requirement of the statute); *Blue Chip Stamps* v. *Manor Drug Stores, supra* ("in connection with the purchase or sale" requirement of the Rule); *Dirks* v. *SEC*, 463 U. S. 646 (1983) (duty to disclose); *Chiarella* v. *United States*, 445 U. S. 222 (1980) (same); *Ernst & Ernst* v. *Hochfelder, supra* (scienter). See also *Carpenter* v. *United States*, 484 U. S. 19 (1987) (confidentiality). The Court also explicitly has defined a standard of materiality under the securities laws, see *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438 (1976), concluding in the proxy-solicitation context that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*, at 449.[7] Acknowledging that certain information concerning corporate developments could well be of "dubious significance," *id.*, at 448, the Court was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Id.*, at 448–449. It further explained that to fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

---

[7] *TSC Industries* arose under § 14(a), as amended, of the 1934 Act, 15 U. S. C. § 78n(a), and Rule 14a–9, 17 CFR § 240.14a–9 (1975).

reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*, at 449. We now expressly adopt the *TSC Industries* standard of materiality for the § 10(b) and Rule 10b–5 context.[8]

## III

The application of this materiality standard to preliminary merger discussions is not self-evident. Where the impact of the corporate development on the target's fortune is certain and clear, the *TSC Industries* materiality definition admits straightforward application. Where, on the other hand, the event is contingent or speculative in nature, it is difficult to ascertain whether the "reasonable investor" would have considered the omitted information significant at the time. Merger negotiations, because of the ever-present possibility that the contemplated transaction will not be effectuated, fall into the latter category.[9]

### A

Petitioners urge upon us a Third Circuit test for resolving this difficulty.[10] See Brief for Petitioners 20–22. Under this

---

[8] This application of the § 14(a) definition of materiality to § 10(b) and Rule 10b–5 is not disputed. See Brief for Petitioners 17, n. 12; Brief for Respondents 30, n. 10; Brief for SEC as *Amicus Curiae* 8, n. 4. See also *McGrath* v. *Zenith Radio Corp.*, 651 F. 2d 458, 466, n. 4 (CA7), cert. denied, 454 U. S. 835 (1981), and *Goldberg* v. *Meridor*, 567 F. 2d 209, 218–219 (CA2 1977), cert. denied, 434 U. S. 1069 (1978).

[9] We do not address here any other kinds of contingent or speculative information, such as earnings forecasts or projections. See generally Hiler, The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views, 46 Md. L. Rev. 1114 (1987).

[10] See *Staffin* v. *Greenberg*, 672 F. 2d 1196, 1207 (CA3 1982) (defining duty to disclose existence of ongoing merger negotiations as triggered when agreement-in-principle is reached); *Greenfield* v. *Heublein, Inc.*, 742 F. 2d 751 (CA3 1984) (applying agreement-in-principle test to materiality inquiry), cert. denied, 469 U. S. 1215 (1985). Citing *Staffin*, the United States Court of Appeals for the Second Circuit has rejected a claim that defendant was under an obligation to disclose various events related to merger negotiations. *Reiss* v. *Pan American World Airways, Inc.*,

approach, preliminary merger discussions do not become material until "agreement-in-principle" as to the price and structure of the transaction has been reached between the would-be merger partners.  See *Greenfield* v. *Heublein, Inc.*, 742 F. 2d 751, 757 (CA3 1984), cert. denied, 469 U. S. 1215 (1985).  By definition, then, information concerning any negotiations not yet at the agreement-in-principle stage could be withheld or even misrepresented without a violation of Rule 10b–5.

Three rationales have been offered in support of the "agreement-in-principle" test.  The first derives from the concern expressed in *TSC Industries* that an investor not be overwhelmed by excessively detailed and trivial information, and focuses on the substantial risk that preliminary merger discussions may collapse: because such discussions are inherently tentative, disclosure of their existence itself could mislead investors and foster false optimism.  See *Greenfield* v. *Heublein, Inc.*, 742 F. 2d, at 756; *Reiss* v. *Pan American World Airways, Inc.*, 711 F. 2d 11, 14 (CA2 1983).  The other two justifications for the agreement-in-principle standard are based on management concerns: because the requirement of "agreement-in-principle" limits the scope of disclosure obligations, it helps preserve the confidentiality of merger discussions where earlier disclosure might prejudice the negotiations; and the test also provides a usable, bright-line rule for determining when disclosure must be made. See *Greenfield* v. *Heublein, Inc.*, 742 F. 2d, at 757; *Flamm*

---

711 F. 2d 11, 13–14 (1983).  The Seventh Circuit recently endorsed the agreement-in-principle test of materiality.  See *Flamm* v. *Eberstadt*, 814 F. 2d 1169, 1174–1179 (describing agreement-in-principle as an agreement on price and structure), cert. denied, 484 U. S. 853 (1987).  In some of these cases it is unclear whether the court based its decision on a finding that no duty arose to reveal the existence of negotiations, or whether it concluded that the negotiations were immaterial under an interpretation of the opinion in *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438 (1976).

v. *Eberstadt*, 814 F. 2d 1169, 1176–1178 (CA7), cert. denied, 484 U. S. 853 (1987).

None of these policy-based rationales, however, purports to explain why drawing the line at agreement-in-principle reflects the significance of the information upon the investor's decision. The first rationale, and the only one connected to the concerns expressed in *TSC Industries*, stands soundly rejected, even by a Court of Appeals that otherwise has accepted the wisdom of the agreement-in-principle test. "It assumes that investors are nitwits, unable to appreciate—even when told—that mergers are risky propositions up until the closing." *Flamm* v. *Eberstadt*, 814 F. 2d, at 1175. Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress. We have recognized time and again, a "fundamental purpose" of the various Securities Acts, "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S., at 186. Accord, *Affiliated Ute Citizens* v. *United States*, 406 U. S. 128, 151 (1972); *Santa Fe Industries, Inc.* v. *Green*, 430 U. S., at 477. The role of the materiality requirement is not to "attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of negotiations," *Flamm* v. *Eberstadt*, 814 F. 2d, at 1175, but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger "mix" of factors to consider in making his investment decision. *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S., at 448–449.

The second rationale, the importance of secrecy during the early stages of merger discussions, also seems irrelevant to an assessment whether their existence is significant to the trading decision of a reasonable investor. To avoid a "bidding war" over its target, an acquiring firm often will insist that negotiations remain confidential, see, *e. g., In re Car-*

*nation Co.*, Exchange Act Release No. 22214, 33 S. E. C. Docket 1025 (1985), and at least one Court of Appeals has stated that "silence pending settlement of the price and structure of a deal is beneficial to most investors, most of the time." *Flamm* v. *Eberstadt*, 814 F. 2d, at 1177.[11]

We need not ascertain, however, whether secrecy necessarily maximizes shareholder wealth—although we note that the proposition is at least disputed as a matter of theory and empirical research[12]—for this case does not concern the *timing* of a disclosure; it concerns only its accuracy and completeness.[13] We face here the narrow question whether information concerning the existence and status of preliminary merger discussions is significant to the reasonable investor's trading decision. Arguments based on the premise that some disclosure would be "premature" in a sense are more properly considered under the rubric of an issuer's duty to disclose. The "secrecy" rationale is simply inapposite to the definition of materiality.

_____

[11] Reasoning backwards from a goal of economic efficiency, that Court of Appeals stated: "Rule 10b–5 is about *fraud*, after all, and it is not fraudulent to conduct business in a way that makes investors better off . . . ." 814 F. 2d, at 1177.

[12] See, *e. g.*, Brown, Corporate Secrecy, the Federal Securities Laws, and the Disclosure of Ongoing Negotiations, 36 Cath. U. L. Rev. 93, 145–155 (1986); Bebchuk, The Case for Facilitating Competing Tender Offers, 95 Harv. L. Rev. 1028 (1982); *Flamm* v. *Eberstadt*, 814 F. 2d, at 1177, n. 2 (citing scholarly debate). See also *In re Carnation Co.*, Exchange Act Release No. 22214, 33 S. E. C. Docket 1025, 1030 (1985) ("The importance of accurate and complete issuer disclosure to the integrity of the securities markets cannot be overemphasized. To the extent that investors cannot rely upon the accuracy and completeness of issuer statements, they will be less likely to invest, thereby reducing the liquidity of the securities markets to the detriment of investors and issuers alike").

[13] See *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 862 (CA2 1968) (en banc) ("Rule 10b–5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public . . . if such assertions are false or misleading or are so incomplete as to mislead . . ."), cert. denied *sub nom. Coates* v. *SEC*, 394 U. S. 976 (1969).

The final justification offered in support of the agreement-in-principle test seems to be directed solely at the comfort of corporate managers. A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the Securities Acts and Congress' policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive. In *TSC Industries* this Court explained: "The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him . . . ." 426 U. S., at 450. After much study, the Advisory Committee on Corporate Disclosure cautioned the SEC against administratively confining materiality to a rigid formula.[14] Courts also would do well to heed this advice.

We therefore find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.

---

[14] "Although the Committee believes that ideally it would be desirable to have absolute certainty in the application of the materiality concept, it is its view that such a goal is illusory and unrealistic. The materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula. The Committee's advice to the [SEC] is to avoid this quest for certainty and to continue consideration of materiality on a case-by-case basis as disclosure problems are identified." House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on Corporate Disclosure to the Securities and Exchange Commission, 95th Cong., 1st Sess., 327 (Comm. Print 1977).

## B

The Sixth Circuit explicitly rejected the agreement-in-principle test, as we do today, but in its place adopted a rule that, if taken literally, would be equally insensitive, in our view, to the distinction between materiality and the other elements of an action under Rule 10b–5:

> "When a company whose stock is publicly traded makes a statement, as Basic did, that 'no negotiations' are underway, and that the corporation knows of 'no reason for the stock's activity,' and that 'management is unaware of any present or pending corporate development that would result in the abnormally heavy trading activity,' information concerning ongoing acquisition discussions becomes material *by virtue of the statement denying their existence.* . . .
>
> .      .      .      .      .
>
> ". . . In analyzing whether information regarding merger discussions is material such that it must be affirmatively disclosed to avoid a violation of Rule 10b–5, the discussions and their progress are the primary considerations.   However, once a statement is made denying the existence of any discussions, even discussions that might not have been material in absence of the denial are material because they make the statement made untrue."   786 F. 2d, at 748–749 (emphasis in original).[15]

---

[15] Subsequently, the Sixth Circuit denied a petition for rehearing en banc in this case.   App. to Pet. for Cert. 144a.   Concurring separately, Judge Wellford, one of the original panel members, then explained that he did not read the panel's opinion to create a "conclusive presumption of materiality for any undisclosed information claimed to render inaccurate statements denying the existence of alleged preliminary merger discussions."   *Id.*, at 145a.   In his view, the decision merely reversed the District Court's judgment, which had been based on the agreement-in-principle standard. *Ibid.*

This approach, however, fails to recognize that, in order to prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.

## C

Even before this Court's decision in *TSC Industries*, the Second Circuit had explained the role of the materiality requirement of Rule 10b–5, with respect to contingent or speculative information or events, in a manner that gave that term meaning that is independent of the other provisions of the Rule. Under such circumstances, materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d, at 849. Interestingly, neither the Third Circuit decision adopting the agreement-in-principle test nor petitioners here take issue with this general standard. Rather, they suggest that with respect to preliminary merger discussions, there are good reasons to draw a line at agreement on price and structure.

In a subsequent decision, the late Judge Friendly, writing for a Second Circuit panel, applied the *Texas Gulf Sulphur* probability/magnitude approach in the specific context of preliminary merger negotiations. After acknowledging that materiality is something to be determined on the basis of the particular facts of each case, he stated:

> "Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions — and this even though the mortality rate of mergers in such formative stages is doubtless high." *SEC* v. *Geon Industries, Inc.*, 531 F. 2d 39, 47–48 (1976).

We agree with that analysis.[16]

Whether merger discussions in any particular case are material therefore depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest. To assess the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value. No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.[17]

---

[16] The SEC in the present case endorses the highly fact-dependent probability/magnitude balancing approach of *Texas Gulf Sulphur*. It explains: "The *possibility* of a merger may have an immediate importance to investors in the company's securities even if no merger ultimately takes place." Brief for SEC as *Amicus Curiae* 10. The SEC's insights are helpful, and we accord them due deference. See *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S., at 449, n. 10.

[17] To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b–5. "No comment" statements are generally the functional equivalent of silence. See *In re Carnation Co.*, Exchange Act Release No. 22214, 33 S. E. C. Docket 1025 (1985). See also New York Stock Exchange Listed Company Manual § 202.01, reprinted in 3 CCH Fed. Sec. L. Rep. ¶ 23,515 (1987) (premature public announcement may properly be delayed for valid business purpose and where adequate security can be maintained); American Stock Exchange Company Guide §§ 401–405, reprinted in 3 CCH Fed. Sec. L. Rep. ¶¶ 23,124A–23,124E (1985) (similar provisions).

It has been suggested that given current market practices, a "no comment" statement is tantamount to an admission that merger discussions are underway. See *Flamm* v. *Eberstadt*, 814 F. 2d, at 1178. That may well hold true to the extent that issuers adopt a policy of truthfully denying merger rumors when no discussions are underway, and of issuing "no comment" statements when they are in the midst of negotiations. There

As we clarify today, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.[18] The fact-specific inquiry we endorse here is consistent with the approach a number of courts have taken in assessing the materiality of merger negotiations.[19] Because the standard of materiality we have

are, of course, other statement policies firms could adopt; we need not now advise issuers as to what kind of practice to follow, within the range permitted by law. Perhaps more importantly, we think that creating an exception to a regulatory scheme founded on a prodisclosure legislative philosophy, because complying with the regulation might be "bad for business," is a role for Congress, not this Court. See also *id.*, at 1182 (opinion concurring in judgment and concurring in part).

[18] We find no authority in the statute, the legislative history, or our previous decisions for varying the standard of materiality depending on who brings the action or whether insiders are alleged to have profited. See, *e. g., Pavlidis* v. *New England Patriots Football Club, Inc.*, 737 F. 2d 1227, 1231 (CA1 1984) ("A fact does not become more material to the shareholder's decision because it is withheld by an insider, or because the insider might profit by withholding it"); cf. *Aaron* v. *SEC*, 446 U. S. 680, 691 (1980) ("[S]cienter is an element of a violation of § 10(b) and Rule 10b–5, regardless of the identity of the plaintiff or the nature of the relief sought").

We recognize that trading (and profit making) by insiders can serve as *an* indication of materiality, see *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d, at 851; *General Portland, Inc.* v. *LaFarge Coppee S. A.*, [1982–1983] CCH Fed. Sec. L. Rep. ¶ 99,148, p. 95,544 (ND Tex. 1981). We are not prepared to agree, however, that "[i]n cases of the disclosure of inside information to a favored few, determination of materiality has a different aspect than when the issue is, for example, an inaccuracy in a publicly disseminated press release." *SEC* v. *Geon Industries, Inc.*, 531 F. 2d 39, 48 (CA2 1976). Devising two different standards of materiality, one for situations where insiders have traded in abrogation of their duty to disclose or abstain (or for that matter when any disclosure duty has been breached), and another covering affirmative misrepresentations by those under no duty to disclose (but under the ever-present duty not to mislead), would effectively collapse the materiality requirement into the analysis of defendant's disclosure duties.

[19] See, *e. g., SEC* v. *Shapiro*, 494 F. 2d 1301, 1306–1307 (CA2 1974) (in light of projected very substantial increase in earnings per share, negotiations material, although merger still less than probable); *Holmes* v. *Bate-*

adopted differs from that used by both courts below, we remand the case for reconsideration of the question whether a grant of summary judgment is appropriate on this record.[20]

## IV

## A

We turn to the question of reliance and the fraud-on-the-market theory. Succinctly put:

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will there-

___

son, 583 F. 2d 542, 558 (CA1 1978) (merger negotiations material although they had not yet reached point of discussing terms); SEC v. Gaspar, [1984–1985] CCH Fed. Sec. L. Rep. ¶ 92,004, pp. 90,977–90,978 (SDNY 1985) (merger negotiations material although they did not proceed to actual tender offer); Dungan v. Colt Industries, Inc., 532 F. Supp. 832, 837 (ND Ill. 1982) (fact that defendants were seriously exploring the sale of their company was material); American General Ins. Co. v. Equitable General Corp., 493 F. Supp. 721, 744–745 (ED Va. 1980) (merger negotiations material four months before agreement-in-principle reached). Cf. Susquehanna Corp. v. Pan American Sulphur Co., 423 F. 2d 1075, 1084–1085 (CA5 1970) (holding immaterial "unilateral offer to negotiate" never acknowledged by target and repudiated two days later); Berman v. Gerber Products Co., 454 F. Supp. 1310, 1316, 1318 (WD Mich. 1978) (mere "overtures" immaterial).

[20] The Sixth Circuit rejected the District Court's narrow reading of Basic's "no developments" statement, see n. 4, supra, which focused on whether petitioners knew of any reason for the activity in Basic stock, that is, whether petitioners were aware of leaks concerning ongoing discussions. 786 F. 2d, at 747. See also Comment, Disclosure of Preliminary Merger Negotiations Under Rule 10b–5, 62 Wash. L. Rev. 81, 82–84 (1987) (noting prevalence of leaks and studies demonstrating that substantial trading activity immediately preceding merger announcements is the "rule, not the exception"). We accept the Court of Appeals' reading of the statement as the more natural one, emphasizing management's knowledge of developments (as opposed to leaks) that would explain unusual trading activity. See id., at 92–93; see also SEC v. Texas Gulf Sulphur Co., 401 F. 2d, at 862–863.

fore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations." *Peil* v. *Speiser*, 806 F. 2d 1154, 1160–1161 (CA3 1986).

Our task, of course, is not to assess the general validity of the theory, but to consider whether it was proper for the courts below to apply a rebuttable presumption of reliance, supported in part by the fraud-on-the-market theory. Cf. the comments of the dissent, *post*, at 252–255.

This case required resolution of several common questions of law and fact concerning the falsity or misleading nature of the three public statements made by Basic, the presence or absence of scienter, and the materiality of the misrepresentations, if any. In their amended complaint, the named plaintiffs alleged that in reliance on Basic's statements they sold their shares of Basic stock in the depressed market created by petitioners. See Amended Complaint in No. C79–1220 (ND Ohio), ¶¶ 27, 29, 35, 40; see also *id.*, ¶ 33 (alleging effect on market price of Basic's statements). Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones. The District Court found that the presumption of reliance created by the fraud-on-the-market theory provided "a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [Federal Rule of Civil Procedure] 23." The District Court thus concluded that with reference to each public statement and its impact upon the open market for Basic shares, common questions predominated over individual questions, as required by Federal Rules of Civil Procedure 23(a)(2) and (b)(3).

Petitioners and their *amici* complain that the fraud-on-the-market theory effectively eliminates the requirement that a plaintiff asserting a claim under Rule 10b–5 prove reliance. They note that reliance is and long has been an element of common-law fraud, see, *e. g.*, Restatement (Second) of Torts § 525 (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108 (5th ed. 1984), and argue that because the analogous express right of action includes a reliance requirement, see, *e. g.*, § 18(a) of the 1934 Act, as amended, 15 U. S. C. § 78r(a), so too must an action implied under § 10(b).

We agree that reliance is an element of a Rule 10b–5 cause of action. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S., at 206 (quoting Senate Report). Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury. See, *e. g.*, *Wilson* v. *Comtech Telecommunications Corp.*, 648 F. 2d 88, 92 (CA2 1981); *List* v. *Fashion Park, Inc.*, 340 F. 2d 457, 462 (CA2), cert. denied *sub nom. List* v. *Lerner*, 382 U. S. 811 (1965). There is, however, more than one way to demonstrate the causal connection. Indeed, we previously have dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established. See *Affiliated Ute Citizens* v. *United States*, 406 U. S., at 153–154. Similarly, we did not require proof that material omissions or misstatements in a proxy statement decisively affected voting, because the proxy solicitation itself, rather than the defect in the solicitation materials, served as an essential link in the transaction. See *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 384–385 (1970).

The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face

transactions contemplated by early fraud cases,[21] and our understanding of Rule 10b–5's reliance requirement must encompass these differences.[22]

> "In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *In re LTV Securities Litigation*, 88 F. R. D. 134, 143 (ND Tex. 1980).

Accord, *e. g.*, *Peil* v. *Speiser*, 806 F. 2d, at 1161 ("In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value"); *Blackie*

---

[21] W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 726 (5th ed. 1984) ("The reasons for the separate development of [the tort action for misrepresentation and nondisclosure], and for its peculiar limitations, are in part historical, and in part connected with the fact that in the great majority of the cases which have come before the courts the misrepresentations have been made in the course of a bargaining transaction between the parties. Consequently the action has been colored to a considerable extent by the ethics of bargaining between distrustful adversaries") (footnote omitted).

[22] Actions under Rule 10b–5 are distinct from common-law deceit and misrepresentation claims, see *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 744–745 (1975), and are in part designed to add to the protections provided investors by the common law, see *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 388–389 (1983).

v. *Barrack*, 524 F. 2d 891, 908 (CA9 1975) ("[T]he same causal nexus can be adequately established indirectly, by proof of materiality coupled with the common sense that a stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock"), cert. denied, 429 U. S. 816 (1976).

## B

Presumptions typically serve to assist courts in managing circumstances in which direct proof, for one reason or another, is rendered difficult. See, *e. g.*, 1 D. Louisell & C. Mueller, Federal Evidence 541–542 (1977). The courts below accepted a presumption, created by the fraud-on-the-market theory and subject to rebuttal by petitioners, that persons who had traded Basic shares had done so in reliance on the integrity of the price set by the market, but because of petitioners' material misrepresentations that price had been fraudulently depressed. Requiring a plaintiff to show a speculative state of facts, *i. e.*, how he would have acted if omitted material information had been disclosed, see *Affiliated Ute Citizens* v. *United States*, 406 U. S., at 153–154, or if the misrepresentation had not been made, see *Sharp* v. *Coopers & Lybrand*, 649 F. 2d 175, 188 (CA3 1981), cert. denied, 455 U. S. 938 (1982), would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market. Cf. *Mills* v. *Electric Auto-Lite Co.*, 396 U. S., at 385.

Arising out of considerations of fairness, public policy, and probability, as well as judicial economy, presumptions are also useful devices for allocating the burdens of proof between parties. See E. Cleary, McCormick on Evidence 968–969 (3d ed. 1984); see also Fed. Rule Evid. 301 and Advisory Committee Notes, 28 U. S. C. App., p. 685. The presumption of reliance employed in this case is consistent with, and, by facilitating Rule 10b–5 litigation, supports, the congressional policy embodied in the 1934 Act. In drafting that Act,

Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets:

"No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells. The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings [sic] about a situation where the market price reflects as nearly as possible a just price. Just as artificial manipulation tends to upset the true function of an open market, so the hiding and secreting of important information obstructs the operation of the markets as indices of real value." H. R. Rep. No. 1383, at 11.

See *Lipton* v. *Documation, Inc.*, 734 F. 2d 740, 748 (CA11 1984), cert. denied, 469 U. S. 1132 (1985).[23]

The presumption is also supported by common sense and probability. Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.[24] It has been noted that "it is hard to imagine that

---

[23] Contrary to the dissent's suggestion, the incentive for investors to "pay attention" to issuers' disclosures comes from their motivation to make a profit, not their attempt to preserve a cause of action under Rule 10b–5. Facilitating an investor's reliance on the market, consistently with Congress' expectations, hardly calls for "dismantling the federal scheme which mandates disclosure." See *post*, at 259.

[24] See *In re LTV Securities Litigation*, 88 F. R. D. 134, 144 (ND Tex. 1980) (citing studies); Fischel, Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law. 1, 4, n. 9 (1982) (citing literature on efficient-capital-market theory); Dennis, Materiality and the Efficient Capital Market Model: A Recipe for the Total Mix, 25 Wm. & Mary L. Rev. 373, 374–381, and n. 1 (1984). We need not determine by adjudication what economists and social scientists have debated

there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Schlanger* v. *Four-Phase Systems Inc.*, 555 F. Supp. 535, 538 (SDNY 1982). Indeed, nearly every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed.[25] Commentators generally have applauded the adoption of one variation or another of the fraud-on-the-market theory.[26] An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

---

through the use of sophisticated statistical analysis and the application of economic theory. For purposes of accepting the presumption of reliance in this case, we need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.

[25] See, *e. g.*, *Peil* v. *Speiser*, 806 F. 2d 1154, 1161 (CA3 1986); *Harris* v. *Union Electric Co.*, 787 F. 2d 355, 367, and n. 9 (CA8), cert. denied, 479 U. S. 823 (1986); *Lipton* v. *Documation, Inc.*, 734 F. 2d 740 (CA11 1984), cert. denied, 469 U. S. 1132 (1985); *T. J. Raney & Sons, Inc.* v. *Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F. 2d 1330, 1332–1333 (CA10 1983), cert. denied *sub nom. Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke* v. *T. J. Raney & Sons, Inc.*, 465 U. S. 1026 (1984); *Panzirer* v. *Wolf*, 663 F. 2d 365, 367–368 (CA2 1981), vacated and remanded *sub nom. Price Waterhouse* v. *Panzirer*, 459 U. S. 1027 (1982); *Ross* v. *A. H. Robins Co.*, 607 F. 2d 545, 553 (CA2 1979), cert. denied, 446 U. S. 946 (1980); *Blackie* v. *Barrack*, 524 F. 2d 891, 905–908 (CA9 1975), cert. denied, 429 U. S. 816 (1976).

[26] See, *e. g.*, Black, Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions, 62 N. C. L. Rev. 435 (1984); Note, The Fraud-on-the-Market Theory, 95 Harv. L. Rev. 1143 (1982); Note, Fraud on the Market: An Emerging Theory of Recovery Under SEC Rule 10b–5, 50 Geo. Wash. L. Rev. 627 (1982).

## C

The Court of Appeals found that petitioners "made public, material misrepresentations and [respondents] sold Basic stock in an impersonal, efficient market. Thus the class, as defined by the district court, has established the threshold facts for proving their loss." 786 F. 2d, at 751.[27] The court acknowledged that petitioners may rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false. *Id.*, at 750, n. 6.

Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. For example, if petitioners could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone.[28] Similarly, if, despite petitioners' allegedly fraudulent at-

---

[27] The Court of Appeals held that in order to invoke the presumption, a plaintiff must allege and prove: (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. See 786 F. 2d, at 750.

Given today's decision regarding the definition of materiality as to preliminary merger discussions, elements (2) and (4) may collapse into one.

[28] By accepting this rebuttable presumption, we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price. Furthermore, our decision today is not to be interpreted as addressing the proper measure of damages in litigation of this kind.

tempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.[29]   Petitioners also could rebut the presumption of reliance as to plaintiffs who would have divested themselves of their Basic shares without relying on the integrity of the market.   For example, a plaintiff who believed that Basic's statements were false and that Basic was indeed engaged in merger discussions, and who consequently believed that. Basic stock was artificially underpriced, but sold his shares nevertheless because of other unrelated concerns, e. g., potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.

### V

In summary:

1. We specifically adopt, for the § 10(b) and Rule 10b–5 context, the standard of materiality set forth in TSC Industries, Inc. v. Northway, Inc., 426 U. S., at 449.

2. We reject "agreement-in-principle as to price and structure" as the bright-line rule for materiality.

3. We also reject the proposition that "information becomes material by virtue of a public statement denying it."

---

[29] We note there may be a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed, for 14 months, on the basis of the three public statements.   Proof of that sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate.   See Fed. Rules Civ. Proc. 23(c)(1) and (c)(4).   See 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure 128–132 (1986).   Thus, we see no need to engage in the kind of factual analysis the dissent suggests that manifests the "oddities" of applying a rebuttable presumption of reliance in this case. See post, at 259–263.

4. Materiality in the merger context depends on the prob- . ability that the transaction will be consummated, and its significance to the issuer of the securities. Materiality depends on the facts and thus is to be determined on a case-by-case basis.

5. It is not inappropriate to apply a presumption of reliance supported by the fraud-on-the-market theory.

6. That presumption, however, is rebuttable.

7. The District Court's certification of the class here was appropriate when made but is subject on remand to such adjustment, if any, as developing circumstances demand.

The judgment of the Court of Appeals is vacated, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I join Parts I–III of the Court's opinion, as I agree that the standard of materiality we set forth in *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438, 449 (1976), should be applied to actions under § 10(b) and Rule 10b–5. But I dissent from the remainder of the Court's holding because I do not agree that the "fraud-on-the-market" theory should be applied in this case.

I

Even when compared to the relatively youthful private cause-of-action under § 10(b), see *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512 (ED Pa. 1946), the fraud-on-the-market theory is a mere babe.[1] Yet today, the Court em-

---

[1] The earliest Court of Appeals case adopting this theory cited by the Court is *Blackie* v. *Barrack*, 524 F. 2d 891 (CA9 1975), cert. denied, 429 U. S. 816 (1976). Moreover, widespread acceptance of the fraud-on-the-

braces this theory with the sweeping confidence usually reserved for more mature legal doctrines. In so doing, I fear that the Court's decision may have many adverse, unintended effects as it is applied and interpreted in the years to come.

A

At the outset, I note that there are portions of the Court's fraud-on-the-market holding with which I am in agreement. Most importantly, the Court rejects the version of that theory, heretofore adopted by some courts,[2] which equates "causation" with "reliance," and permits recovery by a plaintiff who claims merely to have been *harmed* by a material misrepresentation which altered a market price, notwithstanding proof that the plaintiff did not in any way *rely* on that price. *Ante,* at 248. I agree with the Court that if Rule 10b–5's reliance requirement is to be left with any content at all, the fraud-on-the-market presumption must be capable of being rebutted by a showing that a plaintiff did not "rely" on the market price. For example, a plaintiff who decides, months in advance of an alleged misrepresentation, to purchase a stock; one who buys or sells a stock for reasons unrelated to its price; one who actually sells a stock "short" days before the misrepresentation is made—surely none of these people can state a valid claim under Rule 10b–5. Yet, some federal courts have allowed such claims to stand under one variety or another of the fraud-on-the-market theory.[3]

---

market theory in the Courts of Appeals cannot be placed any earlier than five or six years ago. See *ante,* at 246–247, n. 24; Brief for Securities and Exchange Commission as *Amicus Curiae* 21, n. 24.

[2] See, *e. g., Zweig* v. *Hearst Corp.,* 594 F. 2d 1261, 1268–1271 (CA9 1979); *Arthur Young & Co.* v. *United States District Court,* 549 F. 2d 686, 694–695 (CA9), cert. denied, 434 U. S. 829 (1977); *Pellman* v. *Cinerama, Inc.,* 89 F. R. D. 386, 388 (SDNY 1981).

[3] Cases illustrating these factual situations are, respectively, *Zweig* v. *Hearst Corp., supra,* at 1271 (Ely, J., dissenting); *Abrams* v. *Johns-Manville Corp.,* [1981–1982] CCH Fed. Sec. L. Rep. ¶ 98,348, p. 92,157

Happily, the majority puts to rest the prospect of recovery under such circumstances. A nonrebuttable presumption of reliance—or even worse, allowing recovery in the face of "affirmative evidence of nonreliance," *Zweig* v. *Hearst Corp.*, 594 F. 2d 1261, 1272 (CA9 1979) (Ely, J., dissenting)—would effectively convert Rule 10b–5 into "a scheme of investor's insurance." *Shores* v. *Sklar*, 647 F. 2d 462, 469, n. 5 (CA5 1981) (en banc), cert. denied, 459 U. S. 1102 (1983). There is no support in the Securities Exchange Act, the Rule, or our cases for such a result.

### B

But even as the Court attempts to limit the fraud-on-the-market theory it endorses today, the pitfalls in its approach are revealed by previous uses by the lower courts of the broader versions of the theory. Confusion and contradiction in court rulings are inevitable when traditional legal analysis is replaced with economic theorization by the federal courts.

---

(SDNY 1981); *Fausett* v. *American Resources Management Corp.*, 542 F. Supp. 1234, 1238–1239 (Utah 1982).

The *Abrams* decision illustrates the particular pliability of the fraud-on-the-market presumption. In *Abrams*, the plaintiff represented a class of purchasers of defendant's stock who were allegedly misled by defendant's misrepresentations in annual reports. But in a deposition taken shortly after the plaintiff filed suit, she testified that she had bought defendant's stock primarily because she thought that favorable changes in the Federal Tax Code would boost sales of its product (insulation).

Two years later, after the defendant moved for summary judgment based on the plaintiff's failure to prove reliance on the alleged misrepresentations, the plaintiff resuscitated her case by executing an affidavit which stated that she "certainly [had] assumed that the market price of Johns-Manville stock was an accurate reflection of the worth of the company" and would not have paid the then-going price if she had known otherwise. *Abrams*, *supra*, at 92,157. Based on this affidavit, the District Court permitted the plaintiff to proceed on her fraud-on-the-market theory.

Thus, *Abrams* demonstrates how easily a *post hoc* statement will enable a plaintiff to bring a fraud-on-the-market action—even in the rare case where a plaintiff is frank or foolhardy enough to admit initially that a factor other than price led her to the decision to purchase a particular stock.

In general, the case law developed in this Court with respect to § 10(b) and Rule 10b–5 has been based on doctrines with which we, as judges, are familiar: common-law doctrines of fraud and deceit. See, *e. g., Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 471–477 (1977). Even when we have extended civil liability under Rule 10b–5 to a broader reach than the common law had previously permitted, see *ante,* at 244, n. 22, we have retained familiar legal principles as our guideposts. See, *e. g., Herman & MacLean* v. *Huddleston,* 459 U. S. 375, 389–390 (1983). The federal courts have proved adept at developing an evolving jurisprudence of Rule 10b–5 in such a manner. But with no staff economists, no experts schooled in the "efficient-capital-market hypothesis," no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory.[4]

The "wrong turns" in those Court of Appeals and District Court fraud-on-the-market decisions which the Court implicitly rejects as going too far should be ample illustration of the dangers when economic theories replace legal rules as the basis for recovery. Yet the Court today ventures into this area beyond its expertise, beyond—by its own admission—the confines of our previous fraud cases. See *ante,* at 243–244. Even if I agreed with the Court that "modern securi-

---

[4] This view was put well by two commentators who wrote a few years ago:

"Of all recent developments in financial economics, the efficient capital market hypothesis ('ECMH') has achieved the widest acceptance by the legal culture. . . .

"Yet the legal culture's remarkably rapid and broad acceptance of an economic concept that did not exist twenty years ago is not matched by an equivalent degree of *understanding.*" Gilson & Kraakman, The Mechanisms of Market Efficiency, 70 Va. L. Rev. 549, 549–550 (1984) (footnotes omitted; emphasis added).

While the fraud-on-the-market theory has gained even broader acceptance since 1984, I doubt that it has achieved any greater understanding.

ties markets . . . involving millions of shares changing hands daily" require that the "understanding of Rule 10b–5's reliance requirement" be changed, *ibid.*, I prefer that such changes come from Congress in amending § 10(b). The Congress, with its superior resources and expertise, is far better equipped than the federal courts for the task of determining how modern economic theory and global financial markets require that established legal notions of fraud be modified. In choosing to make these decisions itself, the Court, I fear, embarks on a course that it does not genuinely understand, giving rise to consequences it cannot foresee.[5]

For while the economists' theories which underpin the fraud-on-the-market presumption may have the appeal of mathematical exactitude and scientific certainty, they are— in the end—nothing more than theories which may or may not prove accurate upon further consideration. Even the most earnest advocates of economic analysis of the law recognize this. See, *e. g.*, Easterbrook, Afterword: Knowledge and Answers, 85 Colum. L. Rev. 1117, 1118 (1985). Thus, while the majority states that, for purposes of reaching its result it need only make modest assumptions about the way in which "market professionals generally" do their jobs, and how the conduct of market professionals affects stock prices, *ante*, at 246, n. 23, I doubt that we are in much of a position

---

[5] For example, Judge Posner in his Economic Analysis of Law § 15.8, pp. 423–424 (3d ed. 1986), submits that the fraud-on-the-market theory produces the "economically correct result" in Rule 10b–5 cases but observes that the question of damages under the theory is quite problematic. Notwithstanding the fact that "[a]t first blush it might seem obvious," the proper calculation of damages when the fraud-on-the-market theory is applied must rest on several "assumptions" about "social costs" which are "difficult to quantify." *Ibid.* Of course, answers to the question of the proper measure of damages in a fraud-on-the-market case are essential for proper implementation of the fraud-on-the-market presumption. Not surprisingly, the difficult damages question is one the Court expressly declines to address today. *Ante*, at 248, n. 27.

to assess which theories aptly describe the functioning of the securities industry.

Consequently, I cannot join the Court in its effort to reconfigure the securities laws, based on recent economic theories, to better fit what it perceives to be the new realities of financial markets. I would leave this task to others more equipped for the job than we.

## C

At the bottom of the Court's conclusion that the fraud-on-the-market theory sustains a presumption of reliance is the assumption that individuals rely "on the integrity of the market price" when buying or selling stock in "impersonal, well-developed market[s] for securities." *Ante,* at 247. Even if I was prepared to accept (as a matter of common sense or general understanding) the assumption that most persons buying or selling stock do so in response to the market price, the fraud-on-the-market theory goes further. For in adopting a "presumption of reliance," the Court *also* assumes that buyers and sellers rely—not just on the market price—but on the *"integrity"* of that price. It is this aspect of the fraud-on-the-market hypothesis which most mystifies me.

To define the term "integrity of the market price," the majority quotes approvingly from cases which suggest that investors are entitled to "'rely on the price of a stock as a reflection of its value.'" *Ante,* at 244 (quoting *Peil* v. *Speiser,* 806 F. 2d 1154, 1161 (CA3 1986)). But the meaning of this phrase eludes me, for it implicitly suggests that stocks have some "true value" that is measurable by a standard other than their market price. While the scholastics of medieval times professed a means to make such a valuation of a commodity's "worth,"[6] I doubt that the federal courts of our day are similarly equipped.

---

[6] See E. Salin, Just Price, 8 Encyclopaedia of Social Sciences 504–506 (1932); see also R. de Roover, Economic Thought: Ancient and Medieval Thought, 4 International Encyclopaedia of Social Sciences 433–435 (1968).

Even if securities had some "value"—knowable and distinct from the market price of a stock—investors do not always share the Court's presumption that a stock's price is a "reflection of [this] value." Indeed, "many investors purchase or sell stock because they believe the price *inaccurately* reflects the corporation's worth." See Black, Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions, 62 N. C. L. Rev. 435, 455 (1984) (emphasis added). If investors really believed that stock prices reflected a stock's "value," many sellers would never sell, and many buyers never buy (given the time and cost associated with executing a stock transaction). As we recognized just a few years ago: "[I]nvestors act on inevitably incomplete or inaccurate information, [consequently] there are always winners and losers; but those who have 'lost' have not necessarily been defrauded." *Dirks* v. *SEC*, 463 U. S. 646, 667, n. 27 (1983). Yet today, the Court allows investors to recover who can show little more than that they sold stock at a lower price than what might have been.[7]

I do not propose that the law retreat from the many protections that § 10(b) and Rule 10b–5, as interpreted in our prior cases, provide to investors. But any extension of these laws, to approach something closer to an investor in-

---

[7] This is what the Court's rule boils down to in practical terms. For while, in theory, the Court allows for rebuttal of its "presumption of reliance"—a proviso with which I agree, see *supra*, at 251—in practice the Court must realize, as other courts applying the fraud-on-the-market theory have, that such rebuttal is virtually impossible in all but the most extraordinary case. See *Blackie* v. *Barrack*, 524 F. 2d, at 906–907, n. 22; *In re LTV Securities Litigation*, 88 F. R. D. 134, 143, n. 4 (ND Tex. 1980).

Consequently, while the Court considers it significant that the fraud-on-the-market presumption it endorses is a rebuttable one, *ante*, at 242, 248, the majority's implicit rejection of the "pure causation" fraud-on-the-market theory rings hollow. In most cases, the Court's theory will operate just as the causation theory would, creating a nonrebuttable presumption of "reliance" in future Rule 10b–5 actions.

surance scheme, should come from Congress, and not from the courts.

## II

Congress has not passed on the fraud-on-the-market theory the Court embraces today. That is reason enough for us to abstain from doing so. But it is even more troubling that, to the extent that any view of Congress on this question can be inferred indirectly, it is contrary to the result the majority reaches.

## A

In the past, the scant legislative history of § 10(b) has led us to look at Congress' intent in adopting other portions of the Securities Exchange Act when we endeavor to discern the limits of private causes of action under Rule 10b–5. See, e. g., *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 204–206 (1976). A similar undertaking here reveals that Congress flatly rejected a proposition analogous to the fraud-on-the-market theory in adopting a civil liability provision of the 1934 Act.

Section 18 of the Act expressly provides for civil liability for certain misleading statements concerning securities. See 15 U. S. C. § 78r(a). When the predecessor of this section was first being considered by Congress, the initial draft of the provision allowed recovery by any plaintiff "who shall have purchased or sold a security the price of which may have been affected by such [misleading] statement." See S. 2693, 73d Cong., 2d Sess., § 17(a) (1934). Thus, as initially drafted, the precursor to the express civil liability provision of the 1934 Act would have permitted suits by plaintiffs based solely on the fact that the price of the securities they bought or sold was *affected* by a misrepresentation: a theory closely akin to the Court's holding today.

Yet this provision was roundly criticized in congressional hearings on the proposed Securities Exchange Act, because it failed to include a more substantial "reliance" require-

ment.[8]   Subsequent drafts modified the original proposal,
and included an express reliance requirement in the final ver-
sion of the Act.   In congressional debates over the redrafted
version of this bill, the then-Chairman of the House Commit-
tee, Representative Sam Rayburn, explained that the "bill as
originally written was very much challenged on the ground
that reliance should be required.   This objection has been
met."   78 Cong. Rec. 7701 (1934).   Moreover, in a previous
case concerning the scope of § 10(b) and Rule 10b–5, we
quoted approvingly from the legislative history of this re-
vised provision, which emphasized the presence of a strict
reliance requirement as a prerequisite for recovery.   See
*Ernst & Ernst* v. *Hochfelder, supra,* at 206 (citing S. Rep.
No. 792, 73d Cong., 2d Sess., 12–13 (1934)).

Congress thus anticipated meaningful proof of "reliance"
before civil recovery can be had under the Securities Ex-
change Act.   The majority's adoption of the fraud-on-the-
market theory effectively eviscerates the reliance rule in ac-
tions brought under Rule 10b–5, and negates congressional
intent to the contrary expressed during adoption of the 1934
Act.

## B

A second congressional policy that the majority's opinion
ignores is the strong preference the securities laws display
for widespread public disclosure and distribution to investors
of material information concerning securities.   This congres-
sionally adopted policy is expressed in the numerous and var-
ied disclosure requirements found in the federal securities

---

[8] See Stock Exchange Practices, Hearings on S. Res. 84, 56, and 97
before the Senate Committee on Banking and Currency, 73d Cong., 2d
Sess., pt. 15, p. 6638 (1934) (statement of Richard Whitney, President of
the New York Stock Exchange); Stock Exchange Regulation, Hearing on
H. R. 7852 and 8720, before the House Committee on Interstate and For-
eign Commerce, 73d Cong., 2d Sess., 226 (1934) (statement of Richard
Whitney).

law scheme. See, *e. g.*, 15 U. S. C. §§ 78m, 78o(d) (1982 ed. and Supp. IV).

Yet observers in this field have acknowledged that the fraud-on-the-market theory is at odds with the federal policy favoring disclosure. See, *e. g.*, Black, 62 N. C. L. Rev., at 457–459. The conflict between Congress' preference for disclosure and the fraud-on-the-market theory was well expressed by a jurist who rejected the latter in order to give force to the former:

> "[D]isclosure . . . is crucial to the way in which the federal securities laws function. . . . [T]he federal securities laws are intended to put investors into a position from which they can help themselves by relying upon disclosures that others are obligated to make. This system is not furthered by allowing monetary recovery to those who refuse to look out for themselves. If we say that a plaintiff may recover in some circumstances even though he did not read and rely on the defendants' public disclosures, then no one need pay attention to those disclosures and the method employed by Congress to achieve the objective of the 1934 Act is defeated." *Shores* v. *Sklar*, 647 F. 2d, at 483 (Randall, J., dissenting).

It is no surprise, then, that some of the same voices calling for acceptance of the fraud-on-the-market theory also favor dismantling the federal scheme which mandates disclosure. But to the extent that the federal courts must make a choice between preserving effective disclosure and trumpeting the new fraud-on-the-market hypothesis, I think Congress has spoken clearly—favoring the current prodisclosure policy. We should limit our role in interpreting § 10(b) and Rule 10b–5 to one of giving effect to such policy decisions by Congress.

## III

Finally, the particular facts of this case make it an exceedingly poor candidate for the Court's fraud-on-the-market the-

ory, and illustrate the illogic achieved by that theory's application in many cases.

Respondents here are a class of sellers who sold Basic stock between October 1977 and December 1978, a 14-month period. At the time the class period began, Basic's stock was trading at $20 a share (at the time, an all-time high); the last members of the class to sell their Basic stock got a price of just over $30 a share. App. 363, 423. It is indisputable that virtually every member of the class made money from his or her sale of Basic stock.

The oddities of applying the fraud-on-the-market theory in this case are manifest. First, there are the facts that the plaintiffs are sellers and the class period is so lengthy—both are virtually without precedent in prior fraud-on-the-market cases.[9] For reasons I discuss in the margin, I think these two facts render this case less apt to application of the fraud-on-the-market hypothesis.

Second, there is the fact that in this case, there is no evidence that petitioner Basic's officials made the troublesome misstatements for the purpose of manipulating stock prices, or with any intent to engage in underhanded trading of Basic stock. Indeed, during the class period, petitioners do not

---

[9] None of the Court of Appeals cases the Court cites as endorsing the fraud-on-the-market theory, *ante*, at 246–247, n. 24, involved seller-plaintiffs. Rather, all of these cases were brought by purchasers who bought securities in a short period following some material misstatement (or similar act) by an issuer, which was alleged to have falsely inflated a stock's price.

Even if the fraud-on-the-market theory provides a permissible link between such a misstatement and a decision to purchase a security shortly thereafter, surely that link is far more attenuated between misstatements made in October 1977, and a decision to sell a stock the following September, 11 months later. The fact that the plaintiff-class is one of sellers, and that the class period so long, distinguish this case from *any other* cited in the Court's opinion, and make it an even poorer candidate for the fraud-on-the-market presumption. Cf., *e. g., Schlanger* v. *Four-Phase Systems Inc.*, 555 F. Supp. 535 (SDNY 1982) (permitting class of sellers to use fraud-on-the-market theory where the class period was eight days long).

appear to have purchased or sold *any* Basic stock whatsoever. App. to Pet. for Cert. 27a. I agree with *amicus* who argues that "[i]mposition of damages liability under Rule 10b–5 makes little sense . . . where a defendant is neither a purchaser nor a seller of securities." See Brief for American Corporate Counsel Association as *Amicus Curiae* 13. In fact, in previous cases, we had recognized that Rule 10b–5 is concerned primarily with cases where the fraud is committed by one trading the security at issue. See, *e. g., Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 736, n. 8 (1975). And it is difficult to square liability in this case with § 10(b)'s express provision that it prohibits fraud *"in connection with* the purchase or sale of any security." See 15 U. S. C. § 78j(b) (emphasis added).

Third, there are the peculiarities of what kinds of investors will be able to recover in this case. As I read the District Court's class certification order, App. to Pet. for Cert. 123a–126a; *ante,* at 228–229, n. 5, there are potentially many persons who did not purchase Basic stock until *after* the first false statement (October 1977), but who nonetheless *will* be able to recover under the Court's fraud-on-the-market theory. Thus, it is possible that a person who heard the first corporate misstatement and *disbelieved* it—*i. e.,* someone who purchased Basic stock thinking that petitioners' statement was false—may still be included in the plaintiff-class on remand. How a person who undertook such a speculative stock-investing strategy—and made $10 a share doing so (if he bought on October 22, 1977, and sold on December 15, 1978)—can say that he was "defrauded" by virtue of his reliance on the "integrity" of the market price is beyond me.[10]

---

[10] The Court recognizes that a person who *sold* his Basic shares believing petitioners' statements to be false may not be entitled to recovery. *Ante,* at 249. Yet it seems just as clear to me that one who *bought* Basic stock under this same belief—hoping to profit from the uncertainty over Basic's merger plans—should not be permitted to recover either.

And such speculators may not be uncommon, at least in this case. See App. to Pet. for Cert. 125a.

Indeed, the facts of this case lead a casual observer to the almost inescapable conclusion that many of those who bought or sold Basic stock during the period in question flatly disbelieved the statements which are alleged to have been "materially misleading." Despite three statements denying that merger negotiations were underway, Basic stock hit record-high after record-high during the 14-month class period. It seems quite possible that, like Casca's knowing disbelief of Caesar's "thrice refusal" of the Crown,[11] clever investors were skeptical of petitioners' three denials that merger talks were going on. Yet such investors, the savviest of the savvy, will be able to recover under the Court's opinion, as long as they now claim that they believed in the "integrity of the market price" when they sold their stock (between September and December 1978).[12] Thus, persons who bought after hearing and relying on the *falsity* of petitioners' statements may be able to prevail and recover money damages on remand.

And who will pay the judgments won in such actions? I suspect that all too often the majority's rule will "lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers." Cf. *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833, 867 (CA2 1968) (en banc) (Friendly, J., concurring), cert. denied, 394 U. S. 976 (1969). This Court and others have previously recognized that "inexorably broadening . . . the class of plaintiff[s] who may sue in this area of the law will ultimately result in more harm than good." *Blue Chip Stamps* v. *Manor Drug Stores, supra,* at 747–748. See also *Ernst & Ernst* v. *Hochfelder,* 425 U. S., at 214; *Ultramares Corp.* v. *Touche,*

---

[11] See W. Shakespeare, Julius Caesar, Act I, Scene II.

[12] The ease with which such a *post hoc* claim of "reliance on the integrity of the market price" can be made, and gain acceptance by a trial court, is illustrated by *Abrams* v. *Johns-Manville Corp.*, discussed in n. 3, *supra*.

255 N. Y. 170, 179–180, 174 N. E. 441, 444–445 (1931) (Cardozo, C. J.).   Yet such a bitter harvest is likely to be the reaped from the seeds sewn by the Court's decision today.

### IV

In sum, I think the Court's embracement of the fraud-on-the-market theory represents a departure in securities law that we are ill suited to commence—and even less equipped to control as it proceeds.   As a result, I must respectfully dissent.